UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                )
CARL PARKER, et al.,            )
                                )
        Plaintiffs,             )
                                )
    v.                          )          Civil Action No. 17-2834 (PLF)
                                )
UNITED STATES DEPARTMENT OF     )
AGRICULTURE,                    )
                                )
        Defendant.              )
_____)


OPINION

Pending before the Court in this action is the government's motion to dismiss the

complaint [Dkt. No. 12]. In addition, and perhaps in response to the government's motion, pro

se plaintiffs Carl Parker, the estate of Gary Parker (represented by Carl Parker as administrator),

Eddie Slaughter, Lucious Abrams, R.C. Abrams, and Cecil Brewington have filed a motion [Dkt.

No. 13], framed as a "re-petition for mandamus," to compel a formal hearing, to remove a lien

on a farm, and otherwise seek review of the Monitor's decision denying a formal hearing on the

merits pursuant to the Pigford settlement agreement.[1] Upon careful consideration of the parties'

_____

[1]     Plaintiffs filed a motion to compel and for a hearing [Dkt. No. 6] on June 1, 2018,
predating the plaintiff's second motion, the "re-petition for mandamus" [Dkt. No. 13]. On
January 31, 2019, the Court denied the plaintiffs' first motion to compel [Dkt. No. 6] as moot,
reasoning that the second motion to compel appeared to be duplicative of the first motion and
explaining that it would address plaintiffs' second motion.

papers and the Court's prior rulings in the Pigford litigation, the Court will grant the

government's motion to dismiss and deny the plaintiffs' motion.[2]

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. The Pigford *Litigation*

The plaintiffs currently before the Court have brought claims related to their

status as Pigford class members. The long and complicated history of the Pigford class action

litigation has been discussed by this Court many times. Nonetheless, the Court will summarize

the most relevant details for context to the instant petition.

On October 9, 1998, the Court certified a class comprised of African American

farmers who alleged that the United States Department of Agriculture ("USDA") discriminated

against them on the basis of race in distributing the benefits of various federal agricultural

programs. See Pigford v. Glickman, 185 F.R.D. 82, 86 (D.D.C. 1999). Those Pigford class

members asserted that (1) the USDA denied and delayed African American farmers' applications

for loans and other benefits on account of their race, and (2) the USDA ignored and failed to

investigate complaints of discrimination filed by those farmers. See id.

In response to the Pigford I litigation and the scope of the civil rights violations at

the USDA, Congress passed the 1999 Supplemental Appropriations Act ("Act"). See 15 U.S.C.

§ 1691e. Section 741 of the Act changed the statute of limitations on Equal Credit Opportunity

---

[2]     The Court reviewed the following filings and exhibits attached thereto in resolving the pending motions: Complaint ("Compl.") [Dkt. No.1]; Motion to Dismiss ("Mot. to Dismiss") Dkt. No. 12]; Re-Petition for Mandamus Action to Compel ("Mot. to Compel") [Dkt. No. 13]; Plaintiffs' Response to Motion to Dismiss ("Pl. Response") [Dkt. No. 14]; Reply in Support of Defendant's Motion to Dismiss and Response to Plaintiffs' Re-Petition for Mandamus Action ("Gov. Reply") [Dkt. No.18]; Plaintiffs' Reply to Defendant's Response to Mandamus Action ("Pl. Surreply") [Dkt. No. 21].

Act ("ECOA") claims against the USDA, allowing complaints to be brought within two years of Congress' enactment of the legislation. See Pub. L. No. 105-277, § 741, 112 Stat. 2681 (1998). To bring a claim under Section 741, the alleged ECOA violation had to have occurred between January 1, 1981 and December 31, 1996, and the complaints must have been previously reported to the USDA before July 1, 1997. See id. § 741(e).

Section 741 provided affected farmers with two choices regarding the resolution of their claims. The D.C. Circuit clarified those choices in Benoit v. USDA. See Benoit v. USDA, 608 F.3d 17, 19 (D.C. Cir. 2010). The Court in Benoit explained that "Sections 741(a) and (b) each gave affected farmers a distinct option: Either file the claim (a) directly in federal district court or (b) with the USDA, and if the USDA denies the claim, then seek review of the agency decision in district court." Id. Any farmer, "who chooses option (a) 'forego[es]' option (b)." Id. (quoting Garcia v. Vilsack, 563 F.3d 519, 523 (D.C. Cir. 2009)).

For those who sought relief under Section 741(a), class counsel and the USDA reached a settlement agreement, referred to as the Pigford Consent Decree, which was approved by this Court in April 1999. See Pigford v. Glickman, 185 F.R.D. at 95, 113. The Consent Decree established a non-judicial mechanism for deciding class members' individual claims, whereby each claimant elected to pursue his or her claim along one of two distinct tracks. See id. "Track A" claims were evaluated by a third-party neutral, known as the Adjudicator; claimants succeeded on their Track A claims by establishing "substantial evidence" of discrimination. See id. at 96. Claimants who were able to meet the minimal burden of proof under Track A were entitled to liquidated damages not to exceed $50,000 in addition to loan forgiveness of certain debts owed to the USDA. See id. at 97. Those who elected to pursue "Track B" had their claims reviewed by the Arbitrator, another third-party neutral, during a one

day evidentiary "mini-trial." See id.[3] Track B claimants did not face a cap on damages but were required to prove their claims by a more rigorous preponderance of the evidence standard. See id. Class members who did not wish to utilize the claim resolution mechanism set out in the Consent Decree were offered the opportunity to opt out of the class within 120 days of the entry of the Consent Decree. See id. at 95.

After the Court approved the Consent Decree, the parties entered into a stipulation to clarify the nature and scope of the debt relief available to successful claimants. See Pigford v. Schafer, 536 F. Supp. 2d 1, 5 (D.D.C. 2008). The Stipulation established that the loan forgiveness relief for prevailing Track A and Track B claimants – as provided for under paragraphs 9(a)(iii)(A) and 10(g)(ii) of the Consent Decree – applied to "all debts which were identified by the Adjudicator or the Arbitrator as having been affected by the discrimination." See Pigford v. Glickman, No. 97-1978 (PLF), February 7, 2001 Stipulation and Order ("2001 Stipulation") [Dkt. No. 400] ¶ 2. The corresponding debt relief was limited:

> Such relief included all debts incurred at the time of, or after, the first event upon which a finding of discrimination is based, except that such relief shall not include: (a) debts that were incurred under FSA programs other than those as to which a specific finding of discrimination was made by the Adjudicator or Arbitrator with respect to the class member . . . (b) debts that were incurred by the class member prior to the date of the first event upon which the Adjudicator's or Arbitrator's finding is based, or (c) debts that were the subject of litigation separate from this action in which there was a final judgment as to which all appeals have been forgone or completed.

Id. (emphasis added).

Under the terms of the Consent Decree, the decisions of both the Adjudicator (for Track A claims) and the Arbitrator (for Track B claims) were final, except for review by the

---

[3]     In contrast, Track A claimants were not entitled to an evidentiary hearing before the Adjudicator.

Monitor.  See Pigford v. Glickman, No. 97-1978 (PLF), Consent Decree ("Consent Decree") [Dkt. No. 167] ¶¶ 9(v), 10(i).  Track A and Track B claimants who were denied relief by their respective third-party neutrals could petition the Monitor for review within 120 days of the issuance of that decision.  See Consent Decree ¶ 12(b)(iii).  Upon review, the Monitor could direct reexamination of the claim by the third-party neutral if "a clear and manifest error had occurred" that was "likely to result in a miscarriage of justice."  Id.  The Court retained jurisdiction to enforce the Consent Decree through contempt proceedings, but the Consent Decree did not allow the Court to review the decisions of the third-party neutrals – their decisions were final.  See id. ¶¶ 13, 21; see also Pigford v. Vilsack, 777 F.3d 509, 513-14 (D.C. Cir. 2015).  In fact, the "parties consent[ed] 'to forever waive their right to seek review in any court' of 'any claim that is, or could have been[,] decided by' the adjudicator or arbitrator."  See Pigford v. Vilsack, 777 F.3d at 511-12 (quoting Consent Decree ¶¶ 9(a)(v), 10(i)).

The Consent Decree required all Pigford claim packages to have been postmarked on or before October 12, 1999.  See Consent Decree ¶ 5(c).  Paragraph 5(g) of the Consent Decree provided limited relief for late-filing claimants.  See id. ¶ 5(g).  The Court entered a Stipulation and Order on July 14, 2000, extending the time period to submit 5(g) late file petitions to the Facilitator to September 15, 2000.  See Pigford v. Glickman, No. 97-1978 (PLF), Stipulation and Order ("2000 Stipulation and Order") [Dkt. No. 303] at ¶ 2.

By the expiration of the allotted time period for late-filing petitions, it became evident that the number of individuals seeking to submit late claims was overwhelming.  As of September 15, 2000 – the court-ordered deadline for late-filing petition requests to the Facilitator under Paragraph 5(g) of the Consent Decree – more than 61,000 individuals had requested permission to late-file.  See In Re Black Farmers Litig., 856 F. Supp. 2d 1, 11 (D.D.C. 2011);

2000 Stipulation and Order ¶2. Only about four percent were found to have satisfied the high standard – extraordinary circumstances beyond the petitioner's control – and therefore were permitted to late file claims. See id. In response to the large number of late-filed petitions remaining, Congress passed a statute – the Food, Conservation, and Energy Act of 2008 ("FCEA") – permitting claimants whose 5(g) late-filing requests had been denied to resurrect their claims by filing new lawsuits. See Food, Conservation, and Energy Act of 2008, Pub. L. 110-246, §§ 14011-14012, 122 Stat. 1651. The relief provided for those eligible under the FCEA is similar, but not identical, to the original relief granted by the Consent Decree. See Pub. L. 110-246, § 14012. Congress provided that the right to file a complaint to resurrect a claim under Section 14012 of the FCEA would expire on June 18, 2010, two years after the statute's enactment. See id. § 14012.[4]

The Court entered a Wind-down Stipulation and Order in the Pigford I case on November 2, 2015, terminating the provisions of the Consent Decree, subject to a few limited exceptions, including continued loan forgiveness for prevailing claimants. See Pigford v. Glickman, No. 97-1978 (PLF), Wind-down Stipulation and Order ("Wind-down Stip. & Order") [Dkt. No. 2008] at 3. Specifically, the Wind-down Stipulation and Order provided that "[t]he termination of the Consent Decree shall not affect the rights provided under paragraphs 9(a)(iii)(A) and 10(g)(ii) of the Consent Decree." See id. The Order also provided this Court with the authority to enforce the terms of the Wind-down Stipulation and the enduring provisions of the Consent Decree. See id. at 7.

_____

[4] The plaintiffs in the instant case filed their claims under the original Pigford I claims resolution process. They were not late-filers under Paragraph 5(g). As such, they are ineligible for the relief granted by the FCEA.

6

Thus, the vast majority of the <u>Pigford I</u> settlement process is now complete. Some 23,000 initial claimants received over $1 billion in total relief. <u>See</u> <u>Pigford v. Vilsack</u>, No. 97-1987 (PLF), 2016 WL 4921378, at *2 (D.D.C. Sep. 15, 2016). This Court retains jurisdiction under the Consent Decree and the Wind-down Stipulation and Order only to enforce the remaining terms. It continues to receive petitions, filed almost exclusively <u>pro</u> <u>se</u>, from claimants who did not prevail in their entirety under the <u>Pigford I</u> scheme – like those plaintiffs currently before the Court.

## B. The Present Action

The government has filed a motion to dismiss the instant complaint for failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. <u>See</u> Mot. to Dismiss at 2. It argues (1) that the plaintiffs have not alleged sufficient facts to substantiate R.C. Abrams' claims, and (2) as to the remaining claims, that the Court lacks the authority to consider the plaintiffs' claims under the doctrine of <u>res</u> <u>judicata</u> and the terms of the Consent Decree. <u>See</u> <u>id</u>. The six <u>pro</u> <u>se</u> plaintiffs in this action are <u>Pigford</u> claimants, all of whom have received decisions from a third-party neutral and have sought similar relief previously from this Court and from courts in other jurisdictions.[5] The plaintiffs have responded to the government's motion to dismiss and filed a separate motion to compel. The Court interprets the plaintiffs' papers as requesting: an expedited formal hearing of their <u>Pigford</u> claims – to include review of the Monitor's decision – for all plaintiffs, but especially for Track B claimants; a writ of mandamus to compel a formal hearing before an Administrative

---

[5] As will be discussed in further detail <u>infra</u> at 16, the plaintiffs provide little to no information about R.C. Abrams. The Court relies upon the plaintiffs' representations that R.C. Abrams was a <u>Pigford</u> class member.

Law Judge ("ALJ"); a temporary restraining order and injunctive relief against the foreclosure of Gary Parker's and Carl's Parker's farms; the removal of a lien on a farm belonging to Eddie Slaughter and return of offsets applied to his loans; and monetary (and other) damages. The pertinent facts regarding each plaintiff's <u>Pigford</u> claim and his long history of subsequent litigation are outlined below.[6]

### 1. Plaintiffs Carl Parker and Gary Parker

On October 12, 1999, Gary Parker and his brother, Carl Parker, individually filed timely Track A claim packages under the claim adjudication procedure established by the <u>Pigford</u> Consent Decree. <u>See</u> <u>Parker v. United States</u>, 131 Fed. Cl. 1, 12 (2017). Carl Parker's claim was denied in its entirety by the Adjudicator on June 16, 2004. <u>See</u> <u>id</u>. Upon the denial of his claim, Carl Parker petitioned the Monitor for review of the Adjudicator's decision in September 2004. <u>See</u> <u>id</u>. Gary Parker's claim was also denied in its entirety by the Adjudicator on July 1, 2004 for "fail[ure] to establish by substantial evidence that he was the subject of discrimination." <u>See</u> <u>id</u>. The Court can find no record to indicate that Gary Parker timely sought Monitor review. <u>See</u> <u>id</u>.[7]

---

[6]    The following recitation of the factual and procedural history is based on the parties' filings, as well as previous opinions by this Court and others.

[7]    Contrary to the plaintiffs' contention that "Gary Parker has yet to receive a full hearing on the merits as a late filer in which [sic] was covered under Pigford II," <u>see</u> Mot. to Compel at 4, Mr. Parker was a member of the original <u>Pigford</u> class, and therefore is not entitled to any relief under the terms of the <u>Pigford II</u> litigation. <u>See</u> <u>Parker v. United States</u>, 131 Fed. Cl. at 12. In addition, the plaintiffs argue that "Gary Parker, now deceased, was denied both [T]rack [A] and [T]rack [B] and it is the belief of the estate that he filed for a reexamination of the decision." <u>See</u> Pl. Surreply at 18. This is inconsistent with the record established by previous decisions of the Court of Federal Claims. <u>See</u> <u>Parker v. United States</u>, 131 Fed. Cl. at 12.

After reviewing Carl Parker's claim, the Monitor discovered "clear and manifest error" regarding the adjudication of his 1984 farm operating loan, but did not find error in the adjudication of Mr. Parker's claims concerning other loans. See Parker v. United States, 131 Fed. Cl. at 13.[8] The Monitor directed reexamination of Mr. Parker's claim regarding his 1984 operating loan, and upon reexamination, the Adjudicator found in Mr. Parker's favor with respect to that claim and awarded: a one-time $50,000 payment, debt relief, and injunctive and tax relief in accordance with the provisions of the Consent Decree. See id.

Carl Parker became the administrator of his brother's – Gary Parker's – estate following Gary Parker's death in December 2010. See Parker v. United States, 131 Fed. Cl. at 13. In October 2011, Carl Parker was notified by the Farm Service Agency ("FSA") of its plans to accelerate his outstanding loans and those of his brother's estate and to start foreclosure proceedings. See id. The foreclosure proceedings were temporarily stopped in January 2012, when Carl Parker filed a complaint with USDA Office of Civil Rights ("OCR") alleging long-time mistreatment and difficulties in obtaining loan servicing. See id. at 13-14. On June 4, 2014 the OCR closed the case with a finding of no discrimination. As a result, the moratorium on the loan acceleration and foreclosure proceedings was lifted on September 25, 2014. See id. at 14.

Beginning in February 2016, Carl Parker filed a series of complaints and actions in various jurisdictions requesting a formal hearing before a USDA ALJ and relief from foreclosure on his farm. See Parker v. United States, 131 Fed. Cl. at 14. Mr. Parker filed his

---

[8]    In addition to his 1984 farm operating loan, Carl Parker also applied for and received: a farm operating loan in 1985, two farm operating loans in 1986, and a farm ownership loan in 1986. See Parker v. United States, 131 Fed. Cl. at 10. After re-examination was ordered by the Monitor, the Adjudicator found discrimination with respect to only his 1984 farm operating loan. See id. at 12-13.

first complaint with the USDA Office of Administrative Law Judges ("OALJ") on February 25, 2016 as administrator of his brother's estate and on his own behalf, alleging continued racial discrimination and requesting an expedited hearing before an ALJ, a temporary restraining order, and a preliminary injunction. See id. An ALJ issued an order dismissing his petition for a formal hearing in March 2016, explaining that the OALJ lacked jurisdiction because Gary Parker never filed a complaint with the USDA pursuant to Section 741. See id. at 15.[9]

Carl Parker filed a second, nearly identical, complaint with the USDA OALJ on August 24, 2016. See Parker v. United States, 131 Fed. Cl. at 15. In the USDA's response to the complaint, issued September 15, 2016, it again cited the lack of statutory basis for a formal hearing before the OALJ because the Parkers' discrimination claims had already been adjudicated under the terms of the Consent Decree. The OALJ dismissed the complaint with prejudice, citing its lack of authority to grant the requested relief. See id. at 16.

On February 29, 2016, Carl Parker also filed suit in the United States District Court for the Middle District of Georgia alleging, among other things, on-going discrimination and breach of the Pigford Consent Decree due to the reinstatement of his farm ownership loan despite his status as a prevailing Track A claimant. See Parker v. United States, 131 Fed. Cl. at 15. Carl Parker's original complaint requested an injunction against the sale of property and monetary damages. See id. In his amended complaint, he included additional requests for "a formal hearing before an ALJ, reinstatement of the foreclosure moratorium, forgiveness of his farm ownership loan, and removal of any liens against his property." See id. The United States

---

[9]     As discussed supra at 2-3, Section 741 provided farmers with two choices: (a) file a claim in federal district court or (b) file a claim directly with the USDA. See Benoit v. USDA, 608 F.3d at 19. Here, Gary Parker and Carl Parker pursued resolution through the Consent Decree, foreclosing their opportunity to also file a Section 741 claim directly with USDA under option (b).

District Court for the Middle District of Georgia transferred the suit to this Court in October 2016, noting that only the United States District Court for the District of Columbia has jurisdiction to hear claims regarding alleged violations of the Pigford Consent Decree.  See id.  Mr. Parker filed a notice of voluntary dismissal thereafter.  See id.

Concurrent with filing his first OALJ complaint and his suit in the Middle District of Georgia, Carl Parker filed a suit in the Court of Federal Claims on his own behalf and as administrator for his brother's estate.  See Parker v. United States, 131 Fed. Cl. at 16.  Mr. Parker alleged violations of the Consent Decree, the Fifth Amendment to the United States Constitution, Section 14102 of the 2008 Farm Bill, and the Contract Disputes Act of 1978.  See id.  The Court of Federal Claims dismissed the case for lack of subject matter jurisdiction and failure to state a plausible claim for relief.  See id. at 20-22.  It held that it lacked jurisdiction because the statute of limitations imposed by 28 U.S.C. § 2501 – the statute dictating the statute of limitations for filing a claim in the United States Court of Federal Claims – had lapsed.  See id. at 20-21.  The Court of Federal Claims concluded that even if it had jurisdiction, the USDA had not violated the Consent Decree because the USDA had no duty to forgive Carl Parker's farm ownership loan or Gary Parker's farm loans – loans on which neither claimant prevailed – nor did it have a duty to provide Gary Parker a hearing because he had elected Track A.  See id. at 21-22; see also Pigford v. Glickman, 185 F.R.D. at 97.

In the present action, Carl Parker, on behalf of himself and as administrator for Gary Parker's estate, has requested a hearing on the merits of their claims, including a review of the Monitor's decision, and injunctive relief against the foreclosure proceedings of Gary Parker's

and Carl Parker's properties.  See Compl. at 42; see also Mot. to Compel at 4; Pl. Surreply at 17-18.[10]

## 2. Plaintiff Eddie Slaughter

As an original named plaintiff in the Pigford I action, Eddie Slaughter's involvement with this case predates the entry of the Consent Decree.  See Pigford v. Veneman, 355 F. Supp. 2d 148, 156 (D.D.C. 2005).  Although Mr. Slaughter spoke in opposition to the Consent Decree at the fairness hearing in March 1999, he chose not to opt out of the class, see id., and pursued Track A claims for multiple farm loans.  See Slaughter v. United States, 133 Fed. Cl. 712, 713 (2017).  In April 2001, the Adjudicator found sufficient evidence of discrimination with respect to his ownership loans, but not with respect to other loans.  See id.

Following the Adjudicator's decision in 2001, Mr. Slaughter received multiple, confusing communications from USDA.  See Slaughter v. United States, 133 Fed. Cl. at 713.  He received an Internal Revenue Service ("IRS") debt cancellation form and a notice informing him that one of the four loans comprising his Track A claim had been cancelled, but not the remaining three loans.  See id.  USDA later acknowledged the cancellation of two of his loans, but failed to send any updated tax forms to Mr. Slaughter.  See id.  Mr. Slaughter sought and obtained reexamination of the 2001 decision; upon reexamination, the Adjudicator affirmed the

---

[10]     It is not entirely clear from the plaintiffs' filings whether they request that the Court enjoin foreclosure proceedings with respect to Carl Parker's or Gary Parker's property.  In their Surreply, plaintiffs discuss foreclosure on a farm within the context of Carl Parker's Track A prevailing claim.  See Pl. Surreply at 17.  Plaintiffs also discuss Carl Parker, specifically as the administrator of Gary Parker's estate, when requesting a temporary restraining order and preliminary injunction in foreclosure proceedings.  See Complaint at 21.  For purposes of thoroughness, the Court will assume that the plaintiffs ask that the Court intervene to prevent foreclosure on property belonging to Carl Parker and on property separately belonging to Gary Parker.

2001 discrimination finding involving Mr. Slaughter's ownership loans and, consistent with the 2001 decision, denied Mr. Slaughter relief for his operating and emergency loans. See id.

Mr. Slaughter filed a complaint in the United States District Court for the Middle District of Georgia alleging violations of the Consent Decree. See Slaughter v. United States, 133 Fed. Cl. at 713. In 2013, the district court dismissed the claim for lack of jurisdiction, noting that the exclusive jurisdiction for claims relating to the Consent Decree remained with this Court. See id. Two years later, in 2015, Mr. Slaughter filed suit against the United States in the Court of Federal Claims alleging breach of a "settlement agreement" – the Consent Decree – based on the ambiguous communications of IRS debt cancellation sent by the USDA. See Slaughter v. United States, 133 Fed. Cl. at 713-14. He argued that the IRS documents sent to him, mistakenly informing him of loan forgiveness, entitled him to relief from all four of the loans at issue and that the USDA's refusal to discharge him from the debt of three of those loans constituted a breach of the contract. See id. at 714. In September 2017, the Court of Federal Claims dismissed the complaint for lack of subject matter jurisdiction and failure to state a claim on which relief could be granted. See id. at 715.

In the present action, Mr. Slaughter requests that this Court: provide a formal hearing of his Track A claims, including review of the Monitor's decision; compel the removal of the lien on his farm property; and return offsets applied to his loans by the USDA. See Mot. to Compel at 4.

### 3. Plaintiffs Lucious Abrams and Cecil Brewington

As Pigford class members, Lucious Abrams and Cecil Brewington elected to pursue Track B claims. See Pigford v. Vilsack, 78 F. Supp. 3d 247, 248-49 (D.D.C. 2015); Abrams v. Vilsack, 655 F. Supp. 2d 48, 50 (D.D.C. 2009); Brewington v. Vilsack, No. 08-1762

(PLF), 2009 WL 2617910, at *1 (D.D.C. Aug. 24, 2009). Each claim was dismissed by the

Arbitrator on May 31, 2005 and June 6, 2005, respectively. See Abrams v. Vilsack, 655 F. Supp.

2d at 50; Brewington v. Vilsack, 2009 WL 2617910, at *1. Neither Mr. Abrams nor Mr.

Brewington petitioned the Monitor for review of the Arbitrator's decision. See Pigford v.

Vilsack, 78 F. Supp. 3d at 249.

      In dismissing Mr. Abrams' claim, the Arbitrator noted the complexities of his

case. See Abrams v. Vilsack, 655 F. Supp. 2d at 50. Mr. Abrams' attorney had failed to appear

for hearings, to submit evidence in support of his claim, and to file a required memorandum of

the legal and factual issues in dispute. See id. After his attorney withdrew, Mr. Abrams

requested an extension for his Track B claim to enable him to gather the required evidence, find

new representation, and effectively pursue his claim. See id. The Arbitrator denied this request,

reasoning that he had no authority to do so under the terms of the Consent Decree. See id. In

addition, although all Track B claimants are entitled to an evidentiary hearing before their claims

are decided, see Consent Decree ¶ 10(a), the Arbitrator dismissed Mr. Abrams' claim without

holding a hearing because the Arbitrator found that the evidence did not support a showing of

discrimination and allowing the claim to proceed for a hearing would be "an exercise in futility."

See Abrams v. Vilsack, 655 F. Supp. 2d at 50-51.

      Mr. Brewington's experience mirrored Mr. Abrams': He encountered difficulties

with the same attorney, and the Arbitrator denied both a formal hearing and his Track B claim,

likewise finding that "an arbitration hearing in this claim [would be] an exercise in futility." See

Brewington v. Schaffer, No. 08-1762 (PLF), Exhibit No. 2: In re: the Arbitration of Cecil

Brewington, Arbitrator's Reconsideration of Defendant's Motion for Default Judgment [Dkt. No.

3-2] at 6.

Following Congress' enactment of the Food, Conservation, and Energy Act of 2008, Mr. Abrams and Mr. Brewington filed complaints with the Court, renewing their claims of discrimination. See Abrams v. Vilsack, 655 F. Supp. 2d at 51-52; Brewington v. Vilsack, 2009 WL 2617910, at *1. Mr. Abrams' complaint argued that he was entitled to renew his Track B claim against the USDA because the "the FCEA grant[ed] a new cause of action to all individual who ha[d] not obtained a determination on the merits of their Pigford claims due to 'lateness' of any kind." See Abrams v. Vilsack, 655 F. Supp. 2d at 52. Finding that "Mr. Brewington's case [did] not differ in any material respect from the case of Lucious Abrams," see Brewington v. Vilsack, 2009 WL 2617910, at *1, the Court dismissed both complaints on August 2009 for failure to state a claim upon which relief can be granted, as neither claimant fell within the class of Pigford claimants for whom Congress had provided relief under the FCEA. See Pigford v. Vilsack, 78 F. Supp. 2d at 250; Abrams v. Vilsack, 655 F. Supp. 2d at 53 (explaining that the plain language of Section 14102 limits the relief granted by the FCEA to only those Pigford claimants who had previously submitted late-filing requests under Paragraph 5(g) of the Consent Decree); Brewington v. Vilsack, 2009 WL 2617910, at *1 (same). The claimants also argued that the Arbitrator's decisions to dismiss their claims were invalid because he did not hold a hearing, as required under the terms of the Consent Decree; the Court held that it lacked authority to entertain those arguments. See Abrams v. Vilsack, 655 F. Supp. 2d at 52 nn.4-5; Pigford v. Vilsack, 78 F. Supp. 3d at 250.

In 2014, Mr. Abrams and Mr. Brewington again filed nearly identical motions with the Court, this time seeking vacatur of the Arbitrator's decisions dismissing their Track B claims. See Pigford v. Vilsack, 78 F. Supp. 3d at 250. They argued that the Arbitrator's refusal to extend the filing deadlines to allow them to supplement their evidentiary records and the

dismissal of their claims without formal hearings constituted violations of due process and the Consent Decree. See id. Invoking Rule 60(b) of the Federal Rules of Civil Procedure, the pair requested that the Court vacate the decisions of the Arbitrator. See id. The Court denied those motions, citing the same reasons for the Court's dismissal of their 2008 complaints. See id.

In addition, in September 2014, Mr. Abrams, along with his brother R.C. Abrams, filed a complaint in the Superior Court of Burke County in the State of Georgia against defendants Brian Stuckey – the District Director of the Farm Service Agency – and the USDA, and moved for a temporary restraining order and an interlocutory injunction, pending a full merits hearing, to enjoin the defendants from proceeding with foreclosure and sale of their land. See Abrams v. Stuckey, No. 14-1758 (PLF), Notice of Removal ("Notice") [Dkt. No. 1-1] at 8, 34. The defendants removed the case to the United States District Court for the Southern District of Georgia; the district court then granted a motion to change venue to this Court. See Abrams v. Stuckey, No. 14-1758 (PLF), Notice at 1; Abrams v. Stuckey, No. 14-1758 (PLF), Order Granting Motion to Change Venue ("Order to Change Venue") [Dkt. No. 5] at 4. In April 2015, the defendants filed a motion to dismiss the Abrams' complaint for insufficient service of process and failure to prosecute. See Abrams v. Stuckey, No. 14-1758 (PLF), Motion to Dismiss [Dkt. No. 10] at 2. This Court dismissed the complaint without prejudice in August 2015. See Abrams v. Stuckey, No. 14-1758 (PLF), August 19, 2015 Order Granting Motion to Dismiss ("Order to Dismiss") [Dkt. No. 12].

In the instant action, Mr. Abrams and Mr. Brewington request that the Court provide formal hearings of their previously dismissed Track B claims. See Mot. to Compel at 2, 4.

### 4. Plaintiff R.C. Abrams

Although R.C. Abrams is named as a plaintiff in the complaint in this case, no additional information is included regarding his claims or his allegations in the complaint. See Compl. at 25. Plaintiffs provide seemingly contradictory information in later filings. R.C. Abrams is characterized as a Track B plaintiff in the plaintiffs' motion to compel and their response. See Mot. to Compel at 4; Pl. Response at 6. But in the Plaintiffs' Surreply, the plaintiffs' allege that "R.C. Abrams . . . [was] wrongfully denied class 'a' and appealed to the [M]onitor." See Surreply at 10. The only other information that can be gleaned about R.C. Abrams is that he was a plaintiff in the 2014 case filed by the Abrams family in the Superior Court of Burke County in the State of Georgia seeking a temporary restraining order, as detailed above. See Abrams v. Stuckey, No. 14-1758 (PLF), Order to Change Venue [Dkt. No. 5] at 1. R.C. Abrams argues now that he "did not receive any hearing on the merits under the guidelines of the Consent Decree," specifically as a Track B class member. See Pl. Response at 6; see also Mot. to Compel at 4.

## II.  LEGAL STANDARD

Rule 12(b)(6) of the Federal Rules of Civil Procedure allows the Court to dismiss a complaint if a plaintiff has failed "to state a claim upon which relief can be granted." See FED. R. CIV. P. 12(b)(6). Generally, under Rule 8 of the Federal Rules of Civil Procedure, a plaintiff need only provide, "a short and plain statement of the claim showing that the pleader is entitled to relief" that "give[s] the defendant fair notice of what the . . . claim is and the grounds upon which it rests." See Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)). Although "detailed factual allegations" are not necessary to withstand a Rule 12(b)(6) motion to dismiss, the complaint "must contain sufficient factual

matter, accepted as true, 'to state a claim to relief that is plausible on its face.'" See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 555, 570); see also Henok v. Kessler, 78 F. Supp. 3d 452, 457 (D.D.C. 2015). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." In re Interbank Funding Corp. Sec. Litig., 629 F.3d 213, 218 (D.C. Cir. 2010) (quoting Ashcroft v. Iqbal, 556 U.S. at 678).

In deciding a motion to dismiss under Rule 12(b)(6), the Court "must accept as true the factual allegations in the complaint." See Bell Atl. Corp. v. Twombly, 550 U.S. at 572 (quoting Swierkiewicz v. Sorema N.A., 534 U.S. 506, 508 n.1 (2002)); see also Henok v. Kessler, 78 F. Supp. 3d at 457. The Court considers the complaint in its entirety, see Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007), and construes it "liberally in the plaintiffs' favor," see Kowal v. MCI Commc'ns Corp., 16 F.3d 1271, 1276 (D.C. Cir. 1994); see also Hettinga v. United States, 677 F.3d 471, 476 (D.C. Cir. 2012). The Court must grant a plaintiff "the benefit of all inferences that can be derived from the facts alleged," although it need not accept plaintiff's legal conclusions or inferences drawn by the plaintiff if those inferences are unsupported by facts alleged. See Hettinga v. United States, 677 F.3d at 476 (citations omitted); see also Henok v. Kessler, 78 F. Supp. 3d at 457-58; Kaempe v. Meyrs, 367 F.3d 958, 963 (D.C. Cir. 2004) ("Nor must we accept as true the complaint's factual allegations insofar as they contradict exhibits to the complaint or matters subject to judicial notice.").

## III. DISCUSSION

The government argues that the Court lacks the authority to consider the plaintiffs' claims: First, because their claims were dismissed with prejudice when the Consent Decree was entered, the plaintiffs are precluded from raising their claims again now under the

doctrine of res judicata.  See Mot. to Dismiss at 6.  Second, the government argues that the terms

of the Consent Decree prevent the Court from reviewing the decisions of the Arbitrator or

Adjudicator.  See id.  And third, "[w]ith respect to R.C. Abrams, his claims must be denied

because he has failed to assert any allegations in connection with any cause of action he may

have."  See id.  Accordingly, the government contends that the Court must dismiss the plaintiffs'

action for failure to state a claim upon which relief can be granted.  See id.

To the extent that the plaintiffs' instant complaint attempts to resurrect their

claims separate and apart from the claims resolution process created by the Consent Decree, the

Court agrees with the government that such a request is barred by res judicata.  "The doctrine of

res judicata precludes a party from relitigating a claim on which final judgment was previously

reached.  An agreement between the parties dismissing all claims is the equivalent of a decision

on the merits and thus claims settled by an agreement are barred by res judicata."  See Chandler

v. Bernanke, 531 F. Supp. 2d 193, 197 (D.D.C. 2008); see also NextWave Personal Commc'ns,

Inc. v. FCC, 254 F.3d 130, 143 (D.C. Cir. 2001); I.A.M. Nat'l Pension Fund, Benefit Plan A v.

Indus. Gear Mfr. Co., 723 F.2d 944, 947 (D.C. Cir. 1983); Nunnally v. District of Columbia, 243

F. Supp. 3d 55, 64 (D.D.C. 2017); Koch v. Schapiro, 699 F. Supp. 2d 3, 8-9 (D.D.C. 2010).

Within the context of the settlement agreement here, any "[c]laims regarding loans incurred

during the class period were extinguished when the Consent Decree was approved by the Court

in April 1999," and therefore can not be re-litigated.  See Bradshaw v. Veneman, 338 F. Supp.

2d 139, 142 (D.D.C. 2004) (citing Consent Decree ¶ 17).

Plaintiffs' claims can more accurately be framed as "an enforcement action of [the

Consent Decree]."  See Pl. Response at 1.  They argue that "all of the petitioners were accepted

as class members [but] have not received the full performance of the settlement agreement."  See

Mot. to Compel at 4; Pl. Response at 6. The Court therefore proceeds by analyzing the plaintiffs' arguments for violations of the terms of the Consent Decree and by considering whether it has the authority to grant the relief they seek. It concludes, as the government argues, that its authority to review such claims or to provide the requested relief is barred by the terms of the Consent Decree. See Mot. to Dismiss at 10. The plaintiffs are not entitled to a temporary restraining order, a declaratory judgment, or any other type of relief requested in their filings.[11] The Court must therefore dismiss the plaintiffs' complaint for failure to state a claim upon which relief can be granted. See FED. R. CIV. P. 12(b)(6).

### A. Overview of the Court's Authority

At the outset, it is important to reiterate for the plaintiffs that the Court retains very limited authority in this case. When the parties entered into the Consent Decree, the Court dismissed this case with prejudice; all claims were to be resolved through the mechanisms and procedures created by the Consent Decree. See Consent Decree ¶ 17; see also Pigford v. Vilsack, 2016 WL 4921378, at *5. The Consent Decree left the Court with jurisdiction over this matter solely to enforce the terms of the Consent Decree and to remedy violations of its provisions. See Pigford v. Vilsack, 777 F.3d at 513-14; Pigford v. Vilsack, 2016 WL 4921378, at *5; Pigford v. Glickman, 185 F.R.D. at 110. In November 2015, the Court's entry of the Wind-down Stipulation and Order further narrowed its jurisdiction "solely to enforce the terms of this [W]ind-down Stipulation and Order." See Pigford v. Vilsack, 2016 WL 4921378, at *5;

---

[11] It is difficult to discern the arguments and requests of the pro se plaintiffs. The majority of the plaintiffs' complaint is a jumbled compilation of opinions of this Court and other courts. Nevertheless, as is required when construing pro se complaints, the Court strives to interpret the plaintiffs' claims liberally. See Atherton v. District of Columbia Office of Mayor, 567 F.3d 672, 681-82 (D.C. Cir. 2009).

Wind-down Stip. and Order. As the D.C. Circuit has explained, "[e]ven where, as here, the Consent Decree does retain jurisdiction in the District Court to enforce its terms, the court still lacks a 'free-ranging ancillary jurisdiction,' and is limited by the explicit terms of the parties' agreement." See Pigford v. Vilsack, 777 F.3d at 514 (quoting Pigford v. Veneman, 292 F.3d 918, 924 (D.C. Cir. 2002)). For better or for worse, the Court is still constrained to this limited role now.

### B. R.C. Abrams' Claim

The government argues that R.C. Abrams' claim should be dismissed for failure to state a claim because he has "not provided any factual content." See Mot. to Dismiss at 17-18 (emphasis in original). While it is true that the complaint is completely devoid of information related to R.C. Abrams' claim, the plaintiffs' subsequent motion to compel and their response to the government's motion to dismiss provide more information. Courts are permitted "to consider supplemental material filed by a pro se litigant in order to clarify the precise claims being urged." See Greenhill v. Springs, 482 F.3d 569, 572 (D.C. Cir. 2007); see also Stewart v. Nat'l Educ. Ass'n, 471 F.3d 169, 173 (D.C. Cir. 2006). The plaintiffs' later filings provide conflicting information, however. In their motion and response to the government's motion to dismiss, plaintiffs indicate that R.C. Abrams was a Track B claimant and, similar to the other Track B claimants, he "did not receive any hearing on the merits under the guidelines of the Consent Decree." See Pl. Response at 6; Mot. to Compel at 4. On the other hand, in their Surreply, plaintiffs' allege that "R.C. Abrams . . . [was] wrongfully denied class 'a' and appealed to the [M]onitor." See Surreply at 10. Based on the lack of factual support and these confusing assertions alone, the Court agrees that plaintiffs have failed to state a claim upon which relief can be granted. See FED. R. CIV. P. 12(b)(6).

### C.  Formal Hearing on the Merits

Turning to the remainder of the plaintiffs, they request a "formal hearing on the merits" of their claims.  Specifically, they request a hearing on the merits by an ALJ and, perhaps separately, for "repudiation of the Settlement Agreement, to include review of the [M]onitor's decision."  See Compl. at 42; Pl. Mot. at 4.  This Court has already ruled on petitions requesting similar relief – including petitions brought by several of the plaintiffs currently before the Court.  See Abrams v. Vilsack, 655 F. Supp. 2d at 52 nn.4-5; Pigford v. Vilsack, 2016 WL 4921378, at *6.  For the same reasons, it must grant the government's motion and dismiss the plaintiffs' claims.  The Court will explain once again why it is unable to provide the plaintiffs with a hearing on the merits before it or before an ALJ.

Put plainly, as members of the Pigford class, all six plaintiffs knowingly acquiesced to the terms of the Consent Decree, signing on to the processes prescribed.  See Pigford v. Veneman, 355 F. Supp. 2d at 156 (explaining that for those class members who elected to file claims under the mechanisms established by the Consent Decree, "[i]t follows that they had notice of the settlement process and the terms of the Consent Decree and chose to play by the rules agreed to rather than exercise their right to opt out").[12]  Consistent with the terms of the Consent Decree, all of the instant plaintiffs' claims were reviewed through the claim resolution mechanism established by the Consent Decree.  Their claims were reviewed by either

---

[12]     The Court relies on the plaintiffs' representations that R.C. Abrams was a Pigford class member, and without any argument or evidence to the contrary, the Court will assume that his claim was reviewed by the Arbitrator or Adjudicator consistent with the terms of the Consent Decree.  In addition to meriting dismissal because the plaintiffs have not alleged sufficient facts on which to provide relief, as discussed supra at 21, his instant claims also fail for the same reasons that the other five plaintiffs' claims fail – irrespective of whether he filed a claim in Track A or Track B.

the Adjudicator (in the case of Mr. Carl Parker, Mr. Gary Parker, and Mr. Slaughter) or the

Arbitrator (in the case of Mr. Brewington and Mr. Lucious Abrams). Mr. Carl Parker's and Mr.

Slaughter's claim decisions were also reviewed by the Monitor on their petition.

The third-party neutrals found in favor of the government as to some of the

current plaintiffs' claims. The Consent Decree unequivocally established that the decisions of

the third-party neutrals are final judgements, subject to review only by the Monitor. See Consent

Decree ¶¶ 9(a)(v), 9(b)(v), 10(i), 12(b)(iii); see Pigford v. Vilsack, 2016 WL 4921378, at *5

(quoting Abrams v. Vilsack, 655 F. Supp. 2d at 52 n.5). This Court has consistently upheld the

provisions of the Consent Decree concerning the finality of all third-party neutral decisions.[13] In

signing onto the Consent Decree, the parties agreed to the finality of the third-party neutrals'

decisions. They settled on a process and not a specific outcome. See Consent Decree ¶¶ 5-10.[14]

---

[13]     See e.g., Pigford v. Vilsack, 78 F. Supp. 3d at 248 (denying motions seeking vacatur of the Arbitrator's decisions filed by Lucious Abrams and Cecil Brewington); Memorandum Opinion & Order, Pigford v. Vilsack, No. 97-1978 (D.D.C. May 21, 2012) [Dkt. No. 1824] (denying the motions of Henry Burris and Muhammad Robbalaa – on his own behalf and on behalf of the estate of William Burris – seeking vacatur of the Arbitrator's decisions, citing Paragraphs 10(i) and 12(b)(iii) of the consent Decree); Pigford v. Vilsack, 2016 WL 4921378, at *6 (denying Carl Parker's motion for a declaration that he is entitled formal hearing before ALJ); Pigford v. Johanns, 421 F. Supp. 2d 130, 134 (D.D.C. 2006) (denying New Communities Inc.'s motion to vacate Arbitrator's decision); Pigford v. Veneman, No. 97-1978, August 9, 2005 Order [Dkt. No. 1169] (denying John Wright's motion to reverse Adjudicator's decision, citing Paragraphs 9(a)(v) and 12(b)(iii) of Consent Decree).

[14]     There is no mechanism for appeal in this case, pursuant to the agreed-upon terms of the Consent Decree. "Following a day-long fairness hearing at which all interested persons were heard and their views were carefully considered, the Court found that the terms of the Consent Decree, including its finality provisions, were fair, adequate, and reasonable under Rule 23(e) of the Federal Rules of Civil Procedure .. . . [T]he Court stated: 'Many objectors contend that the absence of appeal rights renders the settlement structure unfair and/or that it gives the arbitrators and adjudicators too much power . . . While the objection has force, class counsel made a strategic decision not to press for appeal rights because the government would have insisted that any appeal rights be a two-way street . . . . [T]he Court concludes that the forfeit of appeal rights was a reasonable compromise.'" See Pigford v. Vilsack, 78 F. Supp. 3d at 251

With respect to those claims on which they did not prevail, plaintiffs may not now ask for another bite at the apple – no matter how many times they file this same complaint.

Moreover, the Court has no authority now to order review of the plaintiffs' claims because that is relief that was proscribed by the terms of the Consent Decree. The "parties consent[ed] 'to forever waive their right to seek review in any court' of 'any claim that is, or could have been[,] decided by' the adjudicator or arbitrator." See Pigford v. Vilsack, 777 F.3d at 511-12 (quoting Consent Decree ¶¶ 9(a)(v), 10(i)). Granting the plaintiffs' instant request for a hearing on the merits of their claims – thereby second-guessing the third-party neutrals' prior decisions – would require the Court "not only to act in a manner inconsistent with the terms of the Consent Decree and for which it can find no legal authority, but also in a way that would usurp the Monitor's authority under the Consent Decree." Pigford v. Johanns, 421 F. Supp. 2d at 136. It declines to do so once again.[15]

With regard to the Track B claimants – Lucious Abrams and Cecil Brewington – plaintiffs allege that they "did not receive any hearing on the merits under the guidelines of the Consent Decree." See Pl. Response at 6. Consistent with the parties' representations, the Court is able to find evidence that the Arbitrator did not hold an evidentiary hearing to review the claims of Track B claimants Lucious Abrams and Cecil Brewington. Noting complicated

---

(quoting Pigford v. Glickman, 185 F.R.D. 82, 107-08 (D.D.C. 1999)).

[15] For the same reasons, the Court has no authority to consider the plaintiffs' argument that they are owed a hearing in accordance with their due process rights. See Compl. at 39. The Court has addressed similar claims by Pigford class members in the past, including in those cases filed by Mr. Abrams and Mr. Brewington in 2009. See Abrams v. Vilsack, 655 F. Supp. 2d at 52 nn. 4-5. Consistent with its previous decisions, the Court reiterates that it lacks the authority to address such claims now. See id. The same is true as to the plaintiffs' arguments under "the Civil Rights Act of 1964 – 42 USC 1985 and Civil RICO." See Compl. at 34.

circumstances involving failures by Lucious Abrams' attorney, the Arbitrator dismissed Mr. Abrams' claims without holding a hearing, finding that if he allowed the claim to proceed to a hearing, it would have been an "exercise in futility." See Abrams v. Vilsack, 655 F. Supp. 2d at 50-51. In reviewing Cecil Brewington's claim, the Arbitrator similarly concluded that "an arbitration hearing in this claim [would be] an exercise in futility." See Brewington v. Schaffer, No. 08-1762 (PLF), Exhibit No. 2: In re: the Arbitration of Cecil Brewington, Arbitrator's Reconsideration of Defendant's Motion for Default Judgment [Dkt. No. 3-2] at 6; see also Brewington v. Vilsack, Civil Action No. 08-1762 (PLF), 2009 WL 2617910 (D.D.C. Aug. 24, 2009).

It is true that the Consent Decree explicitly provided for an evidentiary hearing for all Track B claimants. See Consent Decree ¶ 10. But, as already explained, it is also true that the Consent Decree expressly precluded review of a decision by the Arbitrator – and of any third-party neutral, for that matter – by this Court: "The decision of the arbitrator shall be final, except [for review by the Monitor]. The parties hereby agree to forever waive their right to seek review in any court or before any tribunal of the decision of the arbitrator with respect to any claim that is . . . decided[] by the arbitrator." See Consent Decree ¶ 10(i).[16] This finality provision bars this Court from second-guessing a decision by the Arbitrator. The Arbitrator decided not to hold a hearing for Mr. Abrams or Mr. Brewington. As the Court has previously concluded, see Abrams v. Vilsack, 655 F. Supp. 2d at 52 n.5, that decision is final and not

---

[16]       As discussed below, the one exception to the finality of the Arbitrator's decision is the Monitor's ability, upon petition, to review that decision and order the Arbitrator to reexamine claims if the Monitor determines that a "clear and manifest error has occurred" that "has resulted or likely to result in the fundamental miscarriage of justice." See Consent Decree ¶¶ 10(i), 12(b)(iii). Neither Mr. Abrams nor Mr. Brewington petitioned the Monitor for review of the Arbitrator's decision after the dismissals. See Pigford v. Vilsack, 78 F. Supp. 3d at 249.

subject to the Court's review. Just as the Court has explained in previous opinions, the plaintiffs' arguments "can[not] alter the fact that the explicit and carefully negotiated terms of the Consent Decree, which govern the disposition of <u>Pigford</u> class members' individual claims, preclude the relief that they seek from this court." <u>See</u> <u>Pigford v. Vilsack</u>, 78 F. Supp. 3d at 253.

For the same reasons, the Court cannot grant the plaintiffs' request for a hearing to review the Monitor's decision. <u>See</u> Compl. at 31. Carl Parker and Eddie Slaughter are the only plaintiffs currently before the Court who timely sought Monitor review and they both received Monitor review.[17] Just as in the context of the Arbitrator's and Adjudicator's decisions, the Court has no authority under the terms of the Consent Decree to review the Monitor's decisions. <u>See</u> <u>Pigford v. Vilsack</u>, 777 F.3d at 514 ("[T]he Consent Decree renders any determination by the adjudicator 'final' and <u>unreviewable by any court once the [M]onitor has considered any petition for review</u>." (emphasis added)). Moreover, the Monitor was forever discharged and released from all duties under or related to the Consent Decree on March 31, 2012. <u>See</u> Wind-down Stip. & Order at 4. Under the terms of the Wind-down Stipulation and Order issued in 2015, the Court retained the authority to request that the Monitor resume her duties only for the limited purpose of reviewing any petition for Monitor review by one claimant – Maurice McGinnis – due to his unique circumstances and an error by the Facilitator. <u>See</u> <u>id.</u> at

---

[17]     Carl Parker also benefited from the second evaluation of his claims. In his case, the Monitor found clear error upon review and directed reexamination by the Adjudicator of his claim. <u>See</u> <u>Parker v. United States</u>, 131 Fed. Cl. at 13. As for Mr. Slaughter's case, the Monitor affirmed the Adjudicator's earlier decision to find in Mr. Slaughter's favor regarding his ownership loans. <u>See</u> <u>Slaughter v. United States</u>, 133 Fed. Cl. at 713.

4; see also Pigford v. Vilsack, 777 F.3d at 513-16. The Court may not now reinstate the Monitor to review the plaintiffs' claims.[18]

Nor can the Court compel review by an Administrative Law Judge of the USDA. See Mot. to Compel at 1. Plaintiffs argue they are entitled to review by an ALJ as to their claims pursuant to the D.C. Circuit's decision in Benoit and the Administrative Procedure Act ("APA"), and request that the Court issue a writ of mandamus so compelling. See Mot. to Compel at 2. As the Court has explained in previous opinions, it has no authority under the terms of the Consent Decree to order review by an ALJ – by writ of mandamus or otherwise. See, e.g., Pigford v. Vilsack, No. 97-1978, 2016 WL 4921378, at *6 (D.D.C. Sep. 15, 2016). Nowhere in the Consent Decree is that relief made available for class members.

Citing the D.C. Circuit's reasoning in Benoit v. USDA, plaintiffs argue that Section 741 of the 1999 Supplemental Appropriations Act entitles them to such a hearing. See Pl. Response at 3. Plaintiffs allege that the question is "whether or not . . . the ALJ has jurisdiction to conduct a review of the [M]onitor's decision. We think the answer is yes and so did the DC Circuit Court of Appeals as opined in Benoit and McGinnis." See Pl. Response at 3. The Court must disagree. The D.C. Circuit's opinion in Benoit actually says quite the opposite.

Section 741 of the Supplemental Appropriations Act provided farmers seeking to resolve their complaints under Section 741 with two options: (a) file the claim in district court or (b) file the claim directly with the USDA and then seek review of the decision in district court if

_____

[18]        The plaintiffs repeatedly cite to and quote from the D.C. Circuit's opinion in Pigford v. Vilsack, 777 F.3d 509 (D.C. Cir. 2015), primarily to assert that the Court should review the Monitor's decision. The conclusions reached by the D.C. Circuit in that decision are inapposite to the analysis here because the court was discussing the singular case of Maurice McGinnis. Further, the Court of Appeals reaffirmed in that decision that "the Consent Decree renders any determination by the adjudicator 'final' and unreviewable by any court once the [M]onitor has considered a petition for review." See Pigford v. Vilsack, 777 F.3d at 514.

the USDA denies the claim under Section 741(c).  See Benoit v. USDA, 608 F.3d at 19; see also

Pub. L. No. 105-277, § 741, 112 Stat. 2681, 2681-3-1 (1998).  As the D.C. Circuit recognized in

Benoit, "[o]f course, a farmer who chooses option (a) 'foregoes' option (b), and vice versa."  See

Benoit v. USDA, 608 F.3d at 19 (quoting Garcia v. Vilsack, 564 F.3d 519, 523 (D.C. Cir. 2009)).

The plaintiffs in Benoit chose option (b).  See id.  The plaintiffs in the present action, however,

elected to remain in the Pigford class and therefore agreed to not only forgo option (b), but under

the terms of the Consent Decree, waived any right they had to review by an ALJ.  See Consent

Decree ¶¶ 9(a)(v), 10(i)).  They cannot now elect to pursue option (b) upon an adverse decision

by the neutrals under option (a).  See Benoit v. USDA, 608 F.3d at 19; Pigford v. Glickman, 185

F.R.D. at 95.  Thus, contrary to the plaintiffs' assertions, they are not guaranteed a hearing before

an ALJ under the terms of the Consent Decree, and the D.C. Circuit's opinion in Benoit confirms

that.[19]

Nor does the APA authorize this Court to order judicial review by an ALJ.  See

Pl. Response at 2.  Under the APA, the Court's authority to compel an action is limited to

nondiscretionary agency actions.  See 5 U.S.C. § 706; see also Norton v. S. Utah Wilderness

Alliance, 542 U.S. 55, 63 (2004) ("The only agency action that can be compelled under the APA

is action legally required." (emphasis in original)).  The USDA has no obligation to provide a

formal hearing to the instant plaintiffs because all six opted to remain in the Pigford class and

have received final decisions on their claims by the third-party neutrals.

---

[19]    As discussed supra at note 18, the decisions regarding Mr. McGinnis are not
applicable to the present plaintiffs.

*D.  Loan Forgiveness for Eddie Slaughter, Carl Parker, and Gary Parker*

The plaintiffs also request that the Court "enjoin [t]he United States and its agents from foreclosing on the property subject of this suit until plaintiffs have a formal hearing on the merits."  See Compl. at 42.  Relatedly, plaintiffs seek relief pursuant to the loan forgiveness provisions of the Consent Decree for loans on which Carl Parker and Eddie Slaughter prevailed. See Mot. to Compel at 4.  The government does not engage with these arguments directly. Nonetheless, it is clear that the Court has no authority to order the relief requested.

First, plaintiffs request a temporary restraining order and preliminary injunction against foreclosure of Gary Parker's farm.  See Compl. at 21.[20]  In so requesting, the plaintiffs argue that the moratorium against foreclosure proceedings for claimants is still applicable to Gary Parker's farm.  See id. at 21.  The Court disagrees.  The Consent Decree provides for interim administrative relief to protect claimants during the resolution of their claims. Specifically, under Paragraph 7, it imposes a moratorium on USDA's foreclosure proceedings against claimants once the Facilitator determines that the claimant satisfies the class definition. See Consent Decree ¶ 7.  The moratorium, however, only extends for the pendency of the claim and the "USDA may resume its efforts to dispose of any such real property after a final decision in USDA's favor on the class member's claim pursuant to ¶¶ 9 [Track A] or 10 [Track B]." Id. ¶ 7; see also Bradshaw v. Veneman, 338 F. Supp. 2d at 143.  A final decision is reached after

---

[20]      As discussed previously, see supra note 10, it is unclear whether plaintiffs request a temporary restraining order and a preliminary injunction against foreclosure of Gary Parker's farm, Carl Parker's farm, or both.  The Court assumes that the plaintiffs request relief from foreclosure of both Gary Parker's farm and Carl Parker's farm.  See Compl. at 21; Pl. Surreply at 17-18.  Even if the plaintiffs are only requesting relief for one of the properties, the Court has no authority to grant the relief requested as for either farm.

Monitor review or if a petition for review by the Monitor is not filed within 120 days after the Arbitrator's or Adjudicator's decision.  See 2000 Stipulation and Order ¶ 5.

In the present case, the Adjudicator's denial in its entirety of Gary Parker's Track A claim became final 120 days after its issuance when the period to petition the Monitor for review expired without any such petition having been filed.  See Parker v. United States, 131 Fed Cl. at 12; see also 2000 Stipulation and Order ¶ 5.  The protections of Paragraph 7 of the Consent Decree were lifted at that time.  Pursuant to the terms of the Consent Decree, therefore, the USDA was permitted to resume foreclosure proceedings against Gary Parker's farm at that time. See Consent Decree ¶ 7.  Again, the Court simply does not have the authority to overturn or contradict the Adjudicator's decision, see id. ¶ ¶ 9(a)(v), and the Consent Decree does not bestow upon the Court the authority to grant this relief otherwise.

Carl Parker and Eddie Slaughter also appear to seek loan forgiveness for all of the USDA loans for which they filed claims under the Pigford Consent Decree.  See Pl. Surreply at 6.  The plaintiffs argue that the government "repudiates the Consent Decree by not forgiving all the debt incurred by the petitioners from the years 1981 to 1997."  See Pl. Surreply at 6 (emphasis added).  But the plaintiffs are not guaranteed, as they contend, "forgiveness of any debt [they] owe[] to the USDA."  See id. at 6.  According to the terms of the Debt Relief and Stipulation Order, prevailing class members were entitled to the discharge of all outstanding debts to the USDA that were incurred under or affected by the programs that were the subject of such claims resolved in the class member's favor.  See Pigford v. Glickman, No. 97-1978 (PLF), Debt Relief Stipulation and Order [Dkt. No. 400] at 2.  Any loan forgiveness, therefore, was contingent upon a positive finding of discrimination by the third-party neutral.  See Consent Decree ¶ 9(a)(iii)(A) and 10(g)(ii).

Carl Parker now asserts that "[t]he agency did not forgive the farm ownership loan and is now foreclosing on the farm," constituting a "breach of the Pigford Consent Decree." See Pl. Surreply at 17. For the same reasons as explained when considering Gary Parker's farm, supra at 29-30, the Court must reject Carl Parker's arguments related to his loans and is unable to offer relief related to the impending foreclosure on his farm. Carl Parker's claim was denied in its entirety by the Adjudicator; he timely petitioned the Monitor, who directed reexamination of a portion of Mr. Carl Parker's claims. See Parker v. United States, 131 Fed. Cl. at 12. Upon reexamination, the Adjudicator found in Carl Parker's favor regarding supervision of a 1984 operating loan and awarded him (among other forms of relief) debt relief for any farm operating loan debt incurred between January 1, 1984 and December 31, 1996. See id. at 13. The Consent Decree provided for loan forgiveness as to the loans on which petitioners prevailed – and only those loans. Carl Parker did not prevail on his farm ownership loans; he therefore is not entitled to forgiveness on those loans under the Consent Decree, and the Court cannot intervene in the foreclosure for the reasons stated above.

Mr. Slaughter also seeks enforcement of the loan forgiveness provisions. He states that "the respondent has initiated foreclosure procedures against" him on the "farm loan in question [that was] supposed to be written off." See Pl. Surreply at 6. Mr. Slaughter received a decision by the Adjudicator in his favor as to his farm ownership loans – and only those loans – for which he was entitled to discharge. See Slaughter v. United States, 133 Fed. Cl. at 713.[21]

---

[21] Mr. Slaughter has repeatedly sought loan forgiveness in other courts for loans with respect to which he received an adverse decision from the Adjudicator. See Slaughter v. United States, 133 Fed. Cl. at 714; see also Slaughter v. Vilsack, No. 4:12-cv-94 (CDL), 2013 WL 894189, at *1 (M.D.Ga. Mar. 8, 2013). Mr. Slaughter argues that the misleading 1099 tax forms sent by the IRS entitle him to relief of all four loans because those forms are used by the IRS to report debt forgiveness. See Compl. at 29-30; see also Slaughter v. U.S., 133 Fed. Cl. at 714. Although these forms may have caused reasonable confusion, the Consent Decree does not

The parties here do not provide any helpful background information confirming or contesting whether those loans have been forgiven in accordance with the Consent Decree. Thus, the Court looks to the more complete record that was before the Federal Circuit when it decided a similar request by Mr. Slaughter. There, in a letter submitted as part of the Supplemental Appendix to the Appellee's brief, the USDA explains that Mr. Slaughter's farm ownership loans were cancelled in 2002. See United States Court of Appeals for the Federal Circuit, Court of Appeals Docket No. 18-1129, Appellee Informal Brief with Supplemental Appendix ("Appellee Brief") [Dkt. No. 14] at 20. Accordingly, his farm ownership loans – the only loans for which he was entitled to forgiveness – were forgiven consistent with the terms of the Consent Decree and cannot be the source of the foreclosure proceedings.[22]

Mr. Slaughter also requests the return of offsets collected by the USDA for his farm ownership loan. See Mot. to Compel at 4; Pl. Response at 7-8. He attaches a print-out of transactions related to one of his unnamed loans, demonstrating that offsets were collected between 2000 and 2012 as to that unnamed loan. See Pl. Surreply at 12-14. But the offsets listed on that print-out cannot be associated with his farm ownership loan. First, as was discussed, the letter from the USDA explains that Mr. Slaughter's home ownership loans were cancelled in 2002, so any offsets he continued to pay until at least 2012 could not have been related to the loans on which he prevailed under Pigford. Second, the same letter written by the USDA explains that Mr. Slaughter's outstanding operating loans at the time were identified as

provide for loan forgiveness for loans on which the third-party neutral reached an adverse decision. See Consent Decree ¶ 9(a)(iii)(A) and 10(g)(ii).

[22]     The Court notes that Mr. Slaughter's operating loans were "secured by real estate," and thus could be the source of the foreclosure proceedings. See Appellee Brief at 20.

loan number "44-03 and 44-04."  See Appellee Brief at 20.  The loan number listed on the print-out is "44-03."  It follows that the collected offsets listed on the print-out relate to his operating loan, not his home ownership loan.  See Pl. Surreply at 12.  Mr. Slaughter is not entitled to any relief under the Consent Decree for his operating loans – including return of offset payments – because the Adjudicator did not find in his favor as to those loans.[23]  And the Court is not authorized to grant relief for those loans now because it would undermine the final decision of the third-party neutral.  See Consent Decree ¶¶ 9(a)(v), 12(b)(iii); see also Pigford v. Johanns, 421 F. Supp. 2d at 135.

## IV.  CONCLUSION

In sum, the Court is unable to provide the relief requested by the plaintiffs because it is bound by the terms of the Consent Decree – terms that the plaintiffs agreed to as Pigford class members.  For the forgoing reasons, the defendant's motion to dismiss [Dkt. No. 12] is granted, and the plaintiffs' motion to compel and for a hearing [Dkt. No. 13] is denied.  An order consistent with this opinion shall issue this same day.

_____
PAUL L. FRIEDMAN
United States District Judge

DATE:  September 11, 2019

---

[23]     In addition, even if the print-out referred to a loan on which Mr. Slaughter prevailed under Pigford, the collection of offsets is not in and of itself a violation of the Consent Decree.  This Court has previously determined that "the Consent Decree [did] not require USDA to refrain from administrative offsets during the course of the Pigford claims process, and the governing statute requires that it administratively offset such debt."  See Bradshaw v. Veneman, 338 F. Supp. 2d 139, 143-44 (D.D.C. 2004) (citing 31 U.S.C. §3711(g)(9)).  However, if "a claimant eventually succeed[ed] in his or her claim, in some cases USDA will refund any money that was taken by the government by offset."  See id. at 144 (citing to the Monitor's Update: Freeze on USDA Acceleration and Foreclosures).